(76 App. Div. 48.)

### MEDICAL COLLEGE LABORATORY OF THE CITY OF NEW YORK v. NEW YORK UNIVERSITY.

(Supreme Court, Appellate Division, First Department. November 14, 1902.)

PAROL EVIDENCE—DEED.

A medical college conveyed certain property to another educational institution by deed reciting a consideration of $1 and containing no stipulations relating to the control over the educational work of the college. *Held*, in a suit to compel a reconveyance on the theory that the conveyance was made on conditions which defendant had violated, that parol evidence that the conveyance was made under a promise on the grantee's part that its medical committee should always remain constituted of

¶ 1. See Evidence, vol. 20, Cent. Dig. §§ 1912, 1913, 1929.

people acceptable to the governing faculty of the medical college, and that vacancies should be filled by people acceptable to such faculty, was admissible, as showing the real consideration, and that the conveyance, though absolute in form, was made upon conditions of trust entitling the grantor to equitable relief on the grantee's repudiation of the promise. Per Laughlin and O'Brien, JJ.

**2. DEED—RECONVEYANCE.**

Where a medical college conveyed certain property to defendant under a promise on the part of a committee representing it that its medical committee should always remain constituted of people acceptable to the governing faculty of the college, and such promise was repudiated, an action to compel a reconveyance will lie; for, even if the grantee had authority to accept the conveyance on such conditions, it never ratified the promise made by its committee, and therefore equity will not permit it to both repudiate the promise and retain the property, but will imply a trust for the benefit of the grantor. Per Laughlin and O'Brien, JJ.

**3. SAME—FINDING OF TRIAL COURT—EVIDENCE—SUFFICIENCY.**

Evidence in a suit by a medical college to compel a reconveyance of property conveyed by it to defendant *held* to support a finding that the conveyance was made on the promise on the part of a committee of the governing board of the grantee that its medical committee should always remain constituted of people acceptable to the governing faculty of the plaintiff, and that vacancies therein should be filled by people acceptable to such college, and that the grantee has repudiated such promise, and that performance thereof has become impracticable, and therefore the grantor is entitled to a reconveyance. Per Laughlin and O'Brien, JJ.

**4. SAME—SPECIFIC PERFORMANCE.**

Where a medical college conveyed property to defendant under a promise on the part of a committee of the governing board of defendant that its medical committee should always remain constituted of people acceptable to the governing faculty of the medical college, and which promise was never ratified by defendant, but repudiated by it, the court cannot decree a specific performance of the promise, which never became binding on defendant, and especially where defendant has proceeded to organize the medical college in its own way, and disregarding the claims of the grantor. Per Laughlin and O'Brien, JJ.

Van Brunt, P. J., and McLaughlin, J., dissenting.

Appeal from special term, New York county.

Suit by the Medical College Laboratory of the City of New York against the New York University to compel a reconveyance of certain property. From a decree for plaintiff, defendant appeals. Affirmed.

See 71 N. Y. Supp. 243, and 76 N. Y. Supp. 1020.

The theory of the action and the grounds of the decision are that the conveyance was made in trust, or upon conditions, and that the defendant has repudiated the trust or violated the conditions, and that a specific performance is impracticable. It appears that the "subscribers and shareholders of the University of the City of New York" were incorporated in 1831 "for the purpose of promoting literature and science," and it was provided that the corporation should be "conducted and managed" by a council of 32 shareholders and the mayor and four members of the common council. Chapter 176, Laws 1831. In 1837 a committee of 10 physicians associated themselves together for the purpose of organizing a medical department for the university, and an act was passed expressly authorizing the university to grant diplomas upon the "recommendation of the medical faculty" (chapter 25, Laws 1837), which, for brevity, will be called the "faculty." The first plan adopted by the council for the organization of the medical department provided that it should be subject to the control of the council, and that the university should be responsible therefor financially. This plan was not carried out. In 1841 a new plan was proposed, and the following "statutes" were adopted by the

council for the organization of the medical faculty on the 27th day of January, 1841, to wit:

"(1) All expenses for buildings, apparatus, museum, etc., are to be provided for by the medical faculty, and the council shall be in no ways responsible for expenses incurred by the medical faculty.

"(2) Each graduate shall pay to the treasury of the university $20, $10 of which shall be given to the chancellor for each diploma furnished by him, and this shall be the only tax required by the council from the students or faculty.

"(3) Nominations to fill vacancies and to establish new professorships shall come from the faculty to the council.

"(4) The faculty shall have power to make any by-laws for their own government and that of the students, which shall be compatible with the character and general statutes of the university, to regulate the terms of instruction and the fees from students, and to recommend students for diplomas."

On the 3d day of February, 1841, the council supplemented these statutes by by-laws regulating the giving of notices to fill vacancies; providing for increasing the number of professorships beyond six on the recommendation of the faculty; that good moral character and the degree of doctor of medicine should be an essential qualification for a "chair"; that, "it being the mutual desire of the council and faculty to enlarge the usefulness of the medical profession," an effort should be made, as soon as deemed expedient by both, to induce the legislature to extend the term of medical education; and that the council reserved the power to repeal or amend "the plan of organization of the medical faculty." Thereupon a medical faculty were elected, and a committee appointed to organize the same. This committee became permanent, and was known as the "medical committee." It was designed to represent the council in matters pertaining to the faculty, but discharged no function of importance, except as hereinafter specified. The medical department first opened the last week of October, 1841. All vacancies arising in the faculty have been filled by nomination of the faculty and election of such nominees by the council. As the medical college developed, the number of professorships was increased to eight, and filled the same as vacancies. Assistant professors and instructors were employed by the faculty without action on the part of the council. The responsible professors—those who contributed the funds for the establishment of the medical department—were called the "governing faculty," and they managed the business affairs, the council taking no part therein except upon request of the faculty. Degrees were conferred by the university on all candidates recommended by the faculty.

An appropriation from the United States deposit fund was made to the council "for the use of the medical faculty" of $3,000 per year for five years, or until otherwise ordered. Chapter 279, § 3, Laws 1844. But in 1847 the appropriation of $2,000 for each year of 1847 and 1848 was made from the same fund to the "Medical Faculty of the University of New York." Some money appears to have been obtained by committees of the university for the medical college, but scholarships were granted for the same exceeding, according to the regular tuition fees, the amount received. This seems to have been the only direct financial aid given by the university, except that later on its council raised a fund of $10,000 by subscription, and paid the income to the chancellor for his salary as president ex officio of the faculty, in which capacity he only acted on request. From the profits and the investments of the governing faculty, the medical college prospered, and accumulated property. In 1869 an act was passed authorizing "the medical department" to acquire and hold real estate, not exceeding $75,000 in value, in its own name or in the name of a trustee, for purposes of a medical college. Chapter 39, Laws 1869. In 1883 the eight members of the governing faculty were by name constituted a body corporate under the name of the "Medical College Laboratory of the City of New York." Prior to this the medical faculty had applied to the council for consent to incorporate under the name "University Medical College of the City of New York," which does

not appear to have been granted. The Medical College Laboratory Corporation was given power to take and hold property, real and personal, and to issue certificates representing the shares or interest of the incorporators therein who at that time owned all the property. The eight incorporators were constituted a board of directors, and the board given power to fill vacancies arising therein. Chapter 125, Laws 1883. The property of the medical college was transferred by the members of the governing faculty to the corporation. The board of directors assumed the management of the financial or business affairs of the college, and the governing faculty continued the management of the work of education, and maintained relations with the council the same as before. Later three lay members were elected to the board of directors. In 1892 an act was passed authorizing the members of the Medical College Laboratory to transfer their individual shares or interest in the property to the corporation "upon such trusts for educational and scientific purposes and subject to such provisions and conditions" as may be agreed upon, "with power to said corporation for the purposes aforesaid at any time thereafter to enter into an agreement with the University of the City of New York for the use of such property, and with further power at any time, in its discretion, to convey and transfer by deed or gift to said University of the City of New York any or all of such property." Chapter 549, Laws 1892.

The respondent's balance sheet for 1889 shows receipts or assets amounting to $226,074.45, with obligations, including faculty subscriptions or investments, of $148,300. In 1891 or 1892 Col. Oliver H. Payne, a friend of the faculty, donated sufficient money to pay off all obligations then remaining, including the investments or subscriptions of the professors, and by resolution of November 22, 1892, the board of directors declared that all individual ownership should cease on December 1, 1892, and the interest of each director should vest in the corporation on his ceasing to be a member of the board. Col. Payne became a member of the council in 1894. It appears that during the existence of the medical college there was no precedent for the removal of a professor. In the autumn of 1896, the chancellor of the university was approached by Dr. Stimson, a member of the governing faculty, upon the subject of removing one of the professors. The chancellor suggested that the only way was for the medical college to surrender its property to the university, and place itself under the management of the council. It was admitted that the council had been apathetic,—that its old medical committee had not met during the administration of the then chancellor (upwards of 10 years),—and this was ascribed to the independent status of the medical department. Similar suggestions had been made in 1875, again in 1886, and again in 1889; but then the property of the medical college was incumbered, and nothing came of the suggestions. It was not contemplated at those times, however, that the property was to be transferred unconditionally as a gift to the university, nor that the management and control of the medical college was to be placed in the hands of the council. The plan proposed was for the faculty to take back a permanent lease "for themselves and their successors," paying interest on the mortgage (which was to be reduced to $35,000) until discharged, and then free of rent; the faculty also paying taxes, insurance, and repairs. At this interview in 1896 between the chancellor and Dr. Stimson it was mentioned that, if the council ever had the power to remove a professor, it had lapsed with disuse. The advisability of interesting the medical committee in the affairs of the college was discussed, and the chancellor suggested that there were two vacancies in the council that might be filled with friends of the medical college. Dr. Stimson testified that the chancellor said that, if the property of the medical college were transferred to the university, a medical committee would be appointed, "that should have control and direction" of the affairs of the college, and would be composed of men "agreeable" and "satisfactory" to the faculty, and that the faculty were invited to suggest two men to be elected to the council. Dr. Stimson further testified that, after consulting with his colleagues, he proposed Henry F. Dimock, a close friend of Col. Payne, and Charles E. Miller, a director of the Medical College Laboratory. The chancellor's testimony differs from that of Dr. Stimson chiefly in a denial

that he said that the affairs of the college should be under the control of the committee. It does not appear affirmatively whether the nomination of said two members was made with a view of effecting a transfer of the property of the medical college, or merely to obtain a committee that would interest itself in the affairs of the college. On November 2, 1896, the two men proposed by Dr. Stimson were elected members of the council, and were then or soon after placed on the medical committee. The committee then consisted of Henry F. Dimock, chairman, Col. Oliver H. Payne, Charles T. Barney, and Charles E. Miller, with the chancellor ex officio. All except the chancellor were regarded by the governing faculty as their friends. At this time the board of directors of the Medical College Laboratory was composed of five members of the governing faculty and three lay members, one of whom was Charles E. Miller, above named. On November 24, 1896, the medical committee of the council adopted a resolution authorizing the chairman to confer with the executive committee in regard to inviting the Medical College Laboratory to transfer its property to the university in consideration of a guaranty to each member of the governing faculty of a salary of $3,000 per annum for three years. It appears that the compensation of professors had been as high as $5,500, out of the returns of the institution, but were limited to $4,000 after the gift from Col. Payne; and he had guarantied their salaries for a period which had expired; and that, owing to the fact that the course of instruction had been lengthened to four years, it was anticipated that there would be a falling off of revenue, and a possible reduction of salaries. The executive committee approved the resolution of the medical committee, and appointed the chancellor and Mr. Dimock a committee to confer with the Medical College Laboratory, and invited it to confer with said committee. A meeting was held on the 19th day of December, 1896, at which all of the professional members of the board of directors and Mr. Miller were present. The other two lay members were not present. The testimony relating to what took place at that conference is considered in the opinion. On January 28, 1897, the board of directors of the Medical College Laboratory adopted a resolution authorizing and directing the transfer of its property to the appellant. The resolution was preceded by a preamble reciting that the corporation, "in its discretion, consider that the property, real and personal, should be transferred by gift." A deed was executed, dated February 8, 1897, reciting a consideration of $1, and containing an assumption of the debts, if any, of the grantor by the grantee, and conveying premises on the southerly side of Twenty-Sixth street, 150 feet easterly of First avenue, together with all personal property of the grantor wherever situated. The property covered by the deed had cost $200,000 and over, but its value was estimated at from $100,000 to $150,000. The deed was accepted by the council on March 1, 1897. On March 18, 1897, negotiations were formally commenced by the executive committee of the council for a consolidation of the University Medical College with the Bellevue Hospital Medical College. The overtures were promptly accepted by the trustees of Bellevue, and reported by the medical committee to the council on April 5, 1897, and approved. By April 12th, the consolidation seems to have been assured, and on that date the medical committee adopted a resolution calling for the resignations of the eight members of the governing faculty as it existed prior to the transfer from the respondent. The resignations were duly tendered, and reported by the committee to the council, and accepted on May 3, 1897, at which time the medical committee reported university statutes regulating the performance of the duties of the faculty, appointing the officers, professors, adjuncts, and assistants of the faculty, conferring on the committee the power to appoint instructors and assistants, and, with the approval of the executive committee, to fix salaries. This report was adopted. On May 24, 1897, the council met on call, and received a vehement protest from the former faculty of the Bellevue Hospital Medical College against the action already taken. The former action was reconsidered. A substitute for the report of the medical committee was offered, and both the substitute and report referred to the medical committee, with directions to report at an adjourned meeting two days later. The difference between the report and substitute was that the latter stripped the medical committee of its power,

and left the former governing faculty in a minority in the governing faculty of the new or consolidated college. The former report of the committee was the other way, which, it is claimed, would have insured a continuation of the methods and policies which the governing faculty of the respondent had developed.

On the adjourned day the council met, and the medical committee presented a compromise report, acceptable to the old faculty. This was amended by the council in respects regarded as material by the former governing faculty of the respondent, and rendered not acceptable to said faculty by reason thereof. Memorials were submitted by the members of the former governing faculty, urging an abandonment of the plan of consolidation. On June 8, 1897, a hearing was given by the executive committee to the various professors. All from the respondent and some from the Bellevue Hospital Medical College favored an abandonment of the project of consolidation, chiefly because of the lack of harmony and conflicting views. On the 10th the executive committee adopted resolutions approving the scheme, and tabled a resolution offered by Mr. Dimock to abandon it. The action of the committee, as thus amended by the council, was adopted on the same day. After May or June, 1897, the medical committee was not consulted concerning the affairs of the medical department. Six of the professors, members of the former faculty to whom chairs were offered, having declined, the chairs were filled by the election of others for one year. On July 19, 1897, the treasurer reported that he had purchased premises adjoining the former premises of the Medical College Laboratory for a little less than $100,000. On November 1, 1897, the annual election of members of the council was held. The committee on nominations reported Messrs. Miller and Payne, of the then medical committee, for re-election, but not Mr. Dimock. Col. Payne nominated Mr. Dimock. The nominees of the committee were elected. Mr. Dimock withdrew from the meeting. Messrs. Payne, Barney, and C. E. Miller tendered their resignations and withdrew. The resignations were tabled, and a committee was appointed then or subsequently to urge that they withdraw them. This committee received a letter from Col. Payne, dated January 8, 1898, stating that they could not attend the meeting, but setting forth his view of the transaction in part as follows: "I therefore considered myself peculiarly bound to understand fully the conditions upon which the transaction was to be made. I repeatedly conferred with those gentlemen and with the chancellor, and the result was that I entertained no doubt but that it was fully and definitely understood by all parties that, in case the property was turned over, both the property and the entire direction and control of all matters relating to medical affairs should be vested in a medical committee to be constituted by an agreement on individuals by name. Such a committee was constituted, two gentlemen being elected by the council for that purpose. Under such circumstances alone I advised that the property be turned over, otherwise I should not have so advised. I feel that the agreement upon which I relied when giving the advice has been entirely violated, and my own honor demands that the property should be returned." On January 8, 1898, the directors of the Medical College Laboratory made a written request for the retransfer of the property, and stated as a reason therefor that the university had violated the understanding on which the transfer to it had been made in changing the personnel of the medical committee without its consent, and taking from that committee the direction and control of medical affairs.

It appears that there was another corporation, the Loomis Laboratory, whose board of trustees was controlled by the former governing faculty, and which held in trust for the use of the faculty premises and apparatus and an endowment fund, stated to be .$117,000. This property was in the way to be transferred to the university, when the misunderstanding arose and arrested action. In March, 1898, the council reappointed the same six members of the former governing faculty for another year, and elected them to permanent professorships upon the express "condition that the professors support the university statutes and the · university control of the property employed for medical education." This seems to have been understood to mean, among other things, that they were to use their influence to have the

property of the Loomis Laboratory turned over to the university. The professorships were not accepted, and the former members of the faculty sooner or later severed their connection with the university. The time or times when the separation occurred does not definitely appear. The university then fully constituted its medical department with a corps of professors not including any of the former governing faculty, and the same has since so continued. This action was commenced May 24, 1898.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, O'BRIEN, and LAUGHLIN, JJ.

George A. Strong, for appellant.
Bronson Winthrop, for respondent.

LAUGHLIN, J. The respondent was permitted to show, under objection and exception to its competency and admissibility, what took place at the interview between the committees of the respective parties on December 19, 1896, prior to the execution of the deed. The first question to be determined is whether it was error to receive this testimony. It was offered for the purpose of showing that the respondent's agreement to transfer the property was upon the distinct understanding or agreement that the control of the council over matters pertaining to the medical education should be merely nominal, and that in fact such affairs should be entirely under the direction and control of the medical committee of the council, composed of persons agreeable and satisfactory to the medical faculty of the respondent. Briefly stated, the claim of the respondent is that, as the holder of property devoted to medical education, it had a duty and interest in maintaining, continuing, and developing the theories and principles of education and conserving the good will and impetus attained during the long existence of the college, and which are distinct from the property utilized, though intimately associated therewith; that this could be done only by continuing the instruction, direction, and control in the persons who, having taken up the work of their predecessors in the faculty, had carried it on to its then stage of development; that it was for the mutual benefit of both to have the property and business affairs owned and managed by the university, but that this was not to otherwise affect the educational work. The respondent then contends that, upon its being thus shown that the transfer was not intended as an unconditional gift, and that the appellant has violated the condition attached, and rendered specific performance impossible, a court of equity should decree a reconveyance. The appellant insists that the preliminary negotiations or agreement were merged in the resolution and deed, which showed that the conveyance was absolute, and that, therefore, parol evidence was incompetent and inadmissible.

If there was a parol agreement creating a trust or attaching conditions to the transfer, equity will enforce the trust or conditions if valid, provided the same were accepted, and are capable of being performed; but, if the contract be void for indefiniteness or otherwise, or if the trust or conditions have not been accepted, so that specific performance is impossible, equity will decree a return of the property. Associate Alumni v. General Theological Seminary, 26 App. Div. 144, 49 N. Y. Supp. 745; Rank v. Grote, 110 N. Y. 12, 17 N. E. 665; Ahrens v. Jones, 169 N. Y. 555, 62 N. E. 666; Trustees v. Ritch, 151 N. Y.

282, 45 N. E. 876, 37 L. R. A. 305; Peck v. Hoyt, 39 Conn. 9; Peacock v. Nelson, 50 Mo. 256. It may well be that the appellant was not authorized to accept the conveyance on the conditions claimed to have been attached; but, even if it did have such authority, it does not appear that the council ratified the agreement made by its special committee. Nevertheless, the appellant received the property from the respondent, which was under no obligations to make the conveyance except upon such conditions as it saw fit to impose, and, if its consent was given upon these conditions, equity will not permit the appellant to both repudiate them and retain the property, but will hold that it must ratify or repudiate in toto, and will imply a trust to the effect that the grantee, if performance be not made, or be impracticable, hold the property for the benefit of the grantor. Reed v. McConnell, 133 N. Y. 425, 435, 31 N. E. 22; Trust Co. v. Walworth, 1 N. Y. 433; Dix v. Marcy, 116 Mass. 416; Rackemann v. Improvement Co., 167 Mass. 1, 44 N. E. 990, 57 Am. St. Rep. 427; Peacock v. Nelson, supra; Pullman Palace Car Co. v. Central Transp. Co., 171 U. S. 138, 18 Sup. Ct. 808, 43 L. Ed. 108; Chapman v. Douglas Co., 107 U. S. 348, 2 Sup. Ct. 62, 27 L. Ed. 378; Rader's Adm'r v. Maddox, 150 U. S. 128, 14 Sup. Ct. 46, 37 L. Ed. 1025. It is manifest, therefore, that it was important and material to show the parol agreement. We think the evidence was competent upon several grounds: (1) As showing that the real agreement rested in parol, and the deed was executed in part performance thereof (Chapin v. Dobson, 78 N. Y. 74, 34 Am. Rep. 512; Juilliard v. Chaffee, 92 N. Y. 529); (2) as showing the real consideration, and a failure thereof (Baird v. Baird, 145 N. Y. 659, 40 N. E. 222, 28 L. R. A. 375); (3) as showing a collateral agreement not in conflict with the deed, which contains nothing on the subject of control over the educational work (Routledge v. Worthington Co., 119 N. Y. 592, 23 N. E. 1111; Rackemann v. Improvement Co., supra); (4) as showing that the conveyance, though absolute in form, was made upon conditions or in trust, and that it would be a fraud upon the respondent to allow the appellant to repudiate the trust or conditions and retain the property (Rank v. Grote, supra; Trustees v. Ritch, supra; Ahrens v. Jones, supra; Peck v. Hoyt, supra; Dix v. Marcy, supra; Peacock v. Nelson, supra). Upon the evidence thus received the special term held, in effect, that the property was not transferred as a gift, but in consideration of an agreement which has been repudiated, and the performance of which has become impracticable, because of appellant's acts, and for the reason that the council would be in these matters thereby devested of authority to act freely, and, as might seem, for the best interests of the university. The sufficiency of the testimony to justify these findings remains to be considered. There were present at the conference between the committees of the respective parties on the 19th day of December, 1896, Mr. Dimock and the chancellor, constituting the special committee of the council, and Drs. Pardee, Withaus, Stimson, Thompson, and Polk, of the faculty, and Mr. Miller, a member of the council and of the medical committee and of the board of directors of the respondent. With the exception of Dr. Thompson, they were all called as witnesses. Mr. Dimock, who was spokesman for the ap-

pellant's committee, testified, in substance, that he drew attention to the fact that he and Mr. Miller had been elected to the council and placed on the medical committee at the instance of the faculty, together with their friends Col. Payne and Mr. Barney, and stated that, if the respondent would pass its property over to the university, it "would engage that the committee—the medical committee—should always remain constituted of people that were acceptable and satisfactory to the governing faculty; that as vacancies occurred members of the council who were agreeable or acceptable to them would be appointed to the place, and that that committee, so constituted, would have and should have the entire management and control of the property to be turned over and of the affairs of the medical college, and that it should succeed in the appointment of professors to the powers that had been exercised by the governing faculty theretofore"; that, while they were surrendering the management and control, which had been exercised partly by the governing faculty and partly by the board of directors of the respondent, they were giving it to a body "satisfactory to them, and would be continued to be satisfactory to them," and that he thought that this was a "continuation of the state of things" that had "existed from the first"; that the chancellor expressed no dissent to what he stated; that he stated, in answer to a question as to how the governing faculty were to manifest their acceptance of new members of the committee as vacancies occurred, that some means would be devised, and that they could trust the university for that. This testimony of Mr. Dimock was corroborated in the main by the testimony of Mr. Miller and of all of the doctors present, except Dr. Thompson, who was not called. The chancellor's testimony is to the effect that Mr. Dimock spoke of the interest the medical committee would take in the college if the property were transferred, of the increased interest the public would take in the institution if its proprietary character were abolished, and the greater ease with which money could be obtained, and of the personnel of the medical committee; but he says Dimock did not state that the affairs of the medical college should be directed and controlled by the medical committee, and that nothing was said as to the future composition of that committee. In answer to a question with reference to the statement contained in Col. Payne's letter, herein quoted, to the effect that the entire interest and control was to be vested in a medical committee, he said that, if by "vested" was meant only "put under the charge of the medical committee," he would not object to that, but he denied that it was to be vested in that committee exclusively. He further stated that his view of the matter was "that before this conveyance the medical laboratory owned the property, and the members of the governing faculty owned the fees which came from the students, the income of the medical college," and that after the conveyance they ceased to have any legal right other than that of other professors elected without a stated compensation.

It is claimed on the part of the appellant that the testimony of the witnesses who thus gave evidence in behalf of the respondent was materially contradicted by their cross-examination, and by other evidence of their subsequent acts and conduct. This evidence and the

criticisms upon their testimony have been carefully considered. It cannot be discussed at length within the reasonable limits of an opinion. It is sufficient to say that we have reached the conclusion that this was a fair question of fact, and we would not be justified in reversing the decision of the learned trial justice, who had an opportunity to observe the witnesses, on the ground that his conclusion is against the weight of evidence. This testimony introduced on behalf of the respondent is not at all improbable. The respondent and its faculty turned over to the appellant very valuable property and interests. They had the authority to continue themselves and their successors in the charge and control of this property and of the faculty in perpetuity. According to the appellant's claim, this property and all of these rights were surrendered gratuitously and unconditionally. In determining this question, the history of the organization of the faculty, of the incorporation of the respondent, and of the relations existing between the respondent and the faculty and between them and the appellant, the material events of which are recorded in the statements of facts, are quite important. In these circumstances we think the probabilities favor the existence of the reserved rights claimed by the respondent. Rogers v. Land Co., 134 N. Y. 197, 214, 32 N. E. 27. We think the testimony fairly justified a finding that a promise was made on the part of the special committee of the council to the effect that the entire direction and control of the affairs of the medical college should be vested in the medical committee, which should at all times be composed of members satisfactory and agreeable to the faculty; but that there was no definite agreement as to the means by which this was to be accomplished. Five of the eight members of the respondent's board of trustees testified that they voted to transfer the property in reliance upon these promises. In addition to the duty and interest that the respondent had in preserving the continuity of the college work, it had a proprietary interest in the right to the income of the college as the successor of the professors after they resigned, under the resolutions set forth in the statement of facts, which would entitle it to enforce the contract or trust, or recover back the property. Associate Alumni v. Theological Seminary, 163 N. Y. 417, 57 N. E. 626. It is unnecessary to determine whether this was a trust, valid or invalid, which has been repudiated; or a contract that has been rescinded for a breach or upon a consideration that has failed, or is void because not in writing or ultra vires; or a transaction voidable because of mutual mistake,—for in either case the appellant should not ex æquo et bono retain the property, and equity will impress it with a resulting trust for the benefit of respondent, and decree the execution thereof by directing a retransfer.

This is not a case where specific performance may be decreed, for the conditions have been repudiated by the council, and they never became binding upon that body. Furthermore, the members of the faculty have all resigned and are otherwise engaged; and, as to the members of the medical committee, one failed of re-election, and the others resigned from the council and thereby from the committee, and the appellant has filled all vacancies, and proceeded to organize a medical college with a full corps of professors in its own way, disre-

garding the claims of the respondent. The contention that, if these rights were reserved, they would have been embodied in the resolutions or in the conveyance was a fair argument for the consideration of the trial court, and for our consideration in reviewing the decision. It must be borne in mind, however, that the faculty had been permitted always to maintain and govern their property and the medical college without interference on the part of the university, and there was room for trust and confidence that the parol understanding upon which the property was transferred would be carried out by the appellant in good faith. We think that the direct and positive testimony of the witnesses, to which attention has been drawn, has not been overcome. Shortly after the execution of the conveyance the appellant undertook to consolidate with the medical college of respondent, the Bellevue Hospital Medical College, and the council so amended the report of the medical committee, with reference to the assignment of work to the professors, as to put the former Bellevue Hospital professors in control of a material part of the work, and so apportioned the work, against the protest of the members of the former faculty of the respondent, that the ultimate result, as the former faculty regarded it, would be a sacrifice of the principles and methods of instruction theretofore practiced in the medical college of the university, and a substitution thereof of the principles and practice of the Bellevue Hospital College. This was a violation of the agreement that the entire direction and control of the affairs of the medical college should be vested in the medical committee, and, since performance cannot be specifically decreed, the court decided that the property should be retransferred.

It follows, therefore, that the judgment should be affirmed, with costs.

O'BRIEN, J., concurs. PATTERSON, J., concurs in result.

VAN BRUNT, P. J. I cannot concur in the prevailing opinion, either as to its law or its facts. If the conveyance from the plaintiff to the defendant was made upon an understanding or agreement whereby an implied trust arose in favor of the plaintiff, notwithstanding the fact that upon the face of the deed making the conveyance it appeared to have been entirely an absolute one, then it seems to be the settled law, not that the failure upon the part of the grantee to comply with the terms of the implied trust justifies the court in setting aside the conveyance, but that it imposes upon it the duty of enforcing the trust. Associate Alumni v. General Theological Seminary, 163 N. Y. 417, 57 N. E. 626. The fact that a trustee has mistaken his rights under the deed out of which the trust arises has never before been held to invalidate the trust; but the court must impose upon the trustee the specific performance of the trust, which, under the authority of the case last cited, may be coupled with a provision that, in case of a failure to comply with the conditions, the fund be paid over, or surrendered either into court or to trustees appointed by the court. I cannot find that it has ever before been held that, where a party has mistaken his rights under a contract by claiming too much, he

thereby loses all claim to protection as to rights which were admittedly
conferred upon him by the contract.

It further seems to me that the weight of evidence is decidedly
against the proposition which has been urged by the plaintiff, namely,.
that the medical committee of the council of the defendant, with the
assistance of the faculty of the medical department, was to have abso-
lute control of the affairs of such medical department. It seems to
me that an examination of the evidence in this case shows that this
is a mere deduction, which has been arrived at by the various wit-
nesses who testified substantially to that effect. Although this claim
is made by the witnesses upon the part of the plaintiff, it is confessedly,
by their own evidence, untrue. The medical committee of the council
of the defendant, assisted by the medical faculty, were not to have
absolute control. It is admitted that the defendant was to be finan-
cially responsible for the medical department. It is admitted that the
council of the defendant had the power to fix the salaries of the occu-
pants of the various chairs in the medical department. Now, if the
council had this control over so important a branch of the medical
department as the fixing of the salaries of its professors, and were to
be permanently responsible for the medical department, what becomes
of this claim of the absolute control of the medical department being
vested in the committee of the council of the defendant, assisted by the
faculty of the medical department?

Furthermore, there is not a writing or a communication from any
of the witnesses upon the part of the plaintiff that does not contradict
his position upon the witness stand. Let us take particularly the
witness Dimock, who was a member of a subcommittee of the council
of the defendant, and who, it is alleged, made to the committee of the
plaintiff the assurances and assertions in regard to the control of the
business and affairs of the medical department. He swears that he
assured those gentlemen that that control should be in a committee
of the council, which should be appointed at their suggestion, and
satisfactory to them. He says that that was part and parcel of the
arrangement which was entered into between the subcommittee of
the council and the committee of the plaintiff. And yet when he
reports the action of his subcommittee to the council of the university
there is not one word said in regard to any such proposition. Upon
the contrary, his report is that the council of the university were to
have the unreserved control of the business and affairs of the medical
department. There is not a suggestion that there was any reservation
of right upon the part of the plaintiff or its representatives to authori-
tatively interfere in the management of such business. The report
undoubtedly holds forth the idea that these gentlemen were to be
treated fairly by the council of the university, and that in respect to the
question of salaries they should be liberally treated; but there is not
a suggestion of any reservation in the absolute character of the gift
which was to be made by the plaintiff to the defendant. And in this.
connection it is to be observed that the medical department had found
themselves embarrassed for the want of funds; that it was a proprie-
tary institution; that it was found that they could not secure any en-
dowment, or any assistance by way of donation, which would be of

any avail, so long as they remained a proprietary institution; and it was because they desired to be upon the basis of a university, relieved from the proprietary interest, that this arrangement was proposed and was carried into effect. This whole scheme, if the present claim upon the part of the plaintiff is sustained, was a misrepresentation to the world at large of the condition under which this deed of gift was executed. If Mr. Dimock's claim that this reservation was made is well founded, then his failure to report this alleged reservation to the council, to whom he was reporting the transaction, would seem very strongly to savor of an intended suppression of a very material fact, which might, and undoubtedly would, have prevented the council from accepting the gift upon any such terms. Mr. Dimock attempts to excuse this suppression of this very material fact by the assertion that the reports were not written by himself. But it appears that some of them were amended in his own handwriting, and that he read every one of them from beginning to end to the council. It seems to me that Mr. Dimock has one of two horns of a dilemma to take in this situation. Either he is mistaken in regard to what took place at these meetings at which this agreement was entered into, or he has suppressed material facts, which he knew to be material, from the council, of whom he was the trusted agent. It is somewhat difficult to say, under these circumstances, what credit can be placed upon the testimony of a witness whose own acts contradict him in every particular.

But it may be said that there were other witnesses who testified to the same thing,—Drs. Pardee, Withaus, Stimson, Thompson, and Polk, of the medical faculty, and Mr. Miller, a member of the council and of the medical committee of the appellant and of the board of directors of the respondent. It is true that these witnesses have testified—some of them—substantially to the effect that the affairs of the medical department were to be in the hands of the medical committee of the council of the defendant and the faculty of the medical department. But they all concede that the council was to have absolute control of the salaries, and that all that they expected in that regard was that they should be treated fairly. Pardee's testimony as to the matter was that all that there was was an expectation that they would be treated fairly. Drs. Withaus, Stimson, Thompson, and Polk swear to the agreement. But it will be observed that when they sent a written statement of their grievances at about the time the misunderstanding between the medical faculty and the council of the university took place, there is not a suggestion therein that the council has not unreserved control, nor a suggestion of any secret trust or agreement. They say: "It is sufficient to say that the medical committee agreed upon the plan which was adopted by the council on May 14, 1897, and, although that plan was not, in our judgment, free from grave objection, we were ready loyally to accept it." In that plan, adopted by the council on May 14th, there was not a suggestion of any such trust or agreement as is sought to be imposed upon the transaction by this action. As has already been stated, there is not an act performed by any of the parties connected with this transaction at or about the time that is not hostile to the claim now made. Mr. Miller, who was a witness upon

the part of the plaintiff, testified that he was present at the time this alleged secret trust was agreed upon, and he does not say a word as to what took place at that interview. Undoubtedly the persons. who were interested in the plaintiff, and who authorized the directors to make this deed of gift to the defendant for the purpose of relieving themselves of what was deemed to be the stigma of a proprietary school, in order that they might, as a university, get the benefit of an endowment, and although it was conceded that the result of the assumption upon the part of the defendant of this medical school would be a deficit, which it would be necessary for the council of the defendant to make up, expected, and had reason to expect, fair and liberal treatment at the hands of the defendant, not only in respect to the matter of salaries, but also in respect to the management of the affairs of the medical department; and they believed that the method in which the proposed consolidation with the Bellevue Medical College was to be carried out ignored the sacrifices which they had made for the purpose of establishing the close connection between the medical department and the defendant, and was hostile to their interests, and to the ideas which they had cherished and furthered for years. In a letter of the 29th of May, 1897, addressed to the chancellor and council of the defendant, and signed by the witnesses Polk, Stimson, and Thompson, as well as by Drs. Loomis and Woolsey, they say: "We beg to make a reluctant, but most earnest, appeal against action which we are compelled to deem injurious to the highest interest of our school and of medical education, and most embarrassing and distasteful to ourselves. We refer to your action in the matter of the proposed consolidation of your medical department with the Bellevue Hospital Medical College." And, after stating their grievances, they close by saying: "We appeal to you in the name of our common interests and labors in the past, in the name of our school, to whose highest interests we are devoted, and in the name and memory of him, now gone from among us, to whose great services to the university you have yourself, Mr. Chancellor, borne so frequent and eloquent testimony."

Is this the language used by parties who are claiming a want of authority upon the part of the defendant to act? Clearly not. It is true that during the course of that letter they say, "We therefore feel reluctantly compelled formally to state to you that, in our opinion, our agreement with you has been broken, and in a way and to an extent that are greatly prejudicial to the interests of the department and of ourselves;" but what agreement did they there refer to? It is apparent from the preceding part of the letter. They say: "We need not here repeat the conditions that govern such consolidation, which we deemed essential to the welfare of the department and the success of our methods and plans. It is sufficient to say that the medical committee agreed upon a plan which was adopted by the council on May 14th, and, although that plan was not, in our judgment, free from grave objection, we were ready loyally to accept it." That was the agreement that they deemed to be broken. It was the plan adopted by the council on May 14th; and this reservation of power, which formed this secret trust, is nowhere mentioned in that

plan. Again, the same gentlemen write to the chancellor of the defendant on the 4th of June, 1897, and say: "We feel also that the rights, powers, and property which we so recently transferred to the university for the furtherance of certain objects are being used against our judgment for other purposes which are antagonistic, and we appeal through you to the council for the protection of our school and for justice,"—not a suggestion from one end of the written communications to the other of a want of power upon the part of the council, or that there had been any reservation such as is claimed by the oral testimony.

I have not adverted to the oral evidence contradicting the claim of the plaintiff, because it seemed to me that the written declarations of the plaintiff's witnesses so completely refuted their testimony that no instrument in writing could be nullified upon what so clearly appears to be mistaken evidence. If deeds solemnly entered into are to be set aside upon oral testimony contradicted by every written communication of every witness, then, the sooner dependence upon written contracts under seal is abolished, the better.

McLAUGHLIN, J., concurs.