(68 Misc. Rep. 26.)

### HOUGH v. STATE.

(Court of Claims of New York. May, 1910.)

1. WITNESSES (§ 28*)—COMPENSATION—EXPERT—"RETAINER."

"Retainer," as used in an agreement to pay a retainer to an expert witness and a per diem sum for the time he is engaged in the case, means a sum paid to secure the services of the witness, and is due as soon as the witness accepts employment, independent of any future work or its results.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 65, 66; Dec. Dig § 28.*

For other definitions, see Words and Phrases, vol. 7, pp. 6196–6197.]

2. WITNESSES (§ 28*)—COMPENSATION—EXPERTS.

An expert witness is not entitled to the agreed compensation for his services, where his employment is dependent upon his being able to appraise certain manufacturing plants, and testify to a certain value therefor, where he fails to make such an appraisal and testify to such value.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 65, 66; Dec. Dig. § 28.*]

Action by David L. Hough against the State of New York. Judgment for claimant.

Kellogg & Rose, for claimant. Daniel E. Brong, Deputy Atty. Gen., for the State.

SWIFT, J. The claimant seeks to recover for services rendered at the request of the Attorney General, and under a contract made with him as an expert witness in the so-called Consolidated Gas Case.

One of the questions in that case was whether the Consolidated Gas Company could manufacture gas at 80 cents at a fair profit. The gas company had given a large amount of testimony as to the value of its property invested in that business as bearing upon the question of the cost of production. The Attorney General and the counsel

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

acting for him thought it very material and important to show that the value placed upon its property by the gas company was fictitious, and very materially higher than the real value. To show that the values put upon its property by the gas company were much in excess of its real value, the Attorney General, who was a party to the litigation, sought to obtain the testimony of expert witnesses who could testify that the testimony given by the expert Mayer, who was called by the gas company, as to values of its property, had placed too high an estimate upon the value of the property. Mr. Kirby, who was one of the counsel representing the Attorney General, was referred to the claimant herein as an expert upon the value of such property, and communicated with him by letter which led to a personal interview about the 1st of October, 1906. Mr. Kirby stated to the claimant in substance the point they desired to establish, and said he had a copy of some of the testimony of the gas company's expert, Mr. Mayer, and would have more shortly, and wanted to know of claimant whether he would take the testimony and go over it and let Mr. Kirby know if he could give a value to this property substantially less than that given by Mr. Mayer; and also that they wanted the claimant to prepare an estimate of the cost of construction of an ideal modern plant, with a capacity equal to all the present plant of the Consolidated Gas Company. The claimant said:

"He could not say offhand whether he could testify that the value given by Mr. Mayer was higher than it should be; that he wanted an opportunity to go over the testimony."

In this interview claimant stated, in answer to a question by Mr. Kirby, that his terms would be a retainer of $1,000 and $50 a day while actually engaged. To this Mr. Kirby assented. Some time afterward claimant stated to Mr. Kirby that he had looked over the testimony of Mayer, and that he would be able to make an appraisal of this property of the Consolidated Gas Company which would be materially lower than that of Mr. Mayer. The terms of employment were again mentioned. The next day after this interview Mr. Kirby received a letter from claimant, putting into writing the terms of his employment, to which Mr. Kirby replied that it was satisfactory and as he understood it. These two letters furnished the only written evidence of a contract. Claimant contends that the two letters made a complete contract, without any reference as to what testimony he should give. The state contends that it was a part of the agreement, and the very foundation of the contract, that claimant would and could make an appraisal of the property, and testify to the correctness of the same, that would materially reduce the value of the property as testified to by Mr. Mayer. I am of the opinion that the contract was that the claimant should and would make an appraisal and testify to values that would be of material benefit to the Attorney General, otherwise there was no inducement to employ the services of the claimant; and I am of the opinion that claimant did not perform this part of the contract. There was only a reduction of about 10 per cent. in the appraisal made by claimant from that of the witness Mayer; and this made so slight a difference in the cost of production of gas by the Consolidated Gas Company that it was of no material benefit to the Attorney General, and claimant was not called as a witness.

But upon the facts as claimed by the state I am of the opinion that the claim should not be wholly dismissed. According to the testimony of the state's witnesses, claimant could not say what he could testify to, or what his appraisal might be, until he had gone over the testimony of the expert of the gas company. There was a mass of this testimony, and Kirby says that he gave claimant a copy of part of the testimony to go over at the first interview, and at that time claimant stated that he would require a retainer fee of $1,000 and $50 a day while actually engaged in making the appraisal and in testifying as an expert, to which Kirby assented.

A retainer in its legal sense is a sum of money paid to secure the services of the person to be employed. This sum was due as soon as the claimant accepted the employment. It is a fixed sum separate from his daily compensation, and I am of the opinion that he is entitled to this amount when he accepted the testimony of Mayer to examine and began his work. The retainer was in no way dependent upon his future work, or what the result of that work might be.

I am of the opinion that claimant is entitled to an award against the state in the sum of $1,000, and, in addition thereto, the sum of $350 for disbursements for accounts, with the consent of the state.

MURRAY, J., concurs.

RODENBECK, J. This claim is one to recover compensation as an expert in litigation involving the constitutionality of the so-called 80-cent gas statute. The validity of the statute was attacked by the Consolidated Gas Company, and expert evidence was introduced in the case on the part of the company showing, among other things, the value of its plant as bearing upon the question whether or not the company could profitably manufacture and sell gas at 80 cents per thousand cubic feet. The Attorney General was a party defendant in this litigation, and sought to meet the issues by showing that the valuations placed upon the plants by the company's experts were excessive and exaggerated. The claimant insists that his contract is embraced in a letter sent by him to the state's counsel, the terms of which were accepted in a letter in answer thereto; while the state claims that the letter merely expressed a part of an oral agreement preceding the writing of the letter. Under the letter the claimant insists that he was to receive certain compensation for "examining, appraising, consulting and testifying," without any specification as to what his testimony should be; and the state urges that the real contract made between the parties was that the claimant should testify to valuations substantially less than those produced in evidence on behalf of the Consolidated Gas Company.

The case opens with a letter from the state's counsel, Gustavus P. Kirby, to David L. Hough, the claimant, written to the latter September 20, 1906, while the claimant was in the Adirondacks, asking whether or not he would accept a retainer from the state and become a witness in the pending gas litigation and become "one of our experts." The claimant replied to this letter by another, dated the following day, in which he says, "At present I can see no reason why I may not

serve you," and states that he would see Kirby immediately upon his return. The claimant returned to New York about October 1st and on the following day had his first conversation with Kirby with reference to the gas litigation. In the course of this conversation Kirby stated to the claimant:

"Now, what Senator Page and I are looking for is a man who can qualify as an expert and who can go on the witness stand and honestly and aggressively testify that in his opinion the appraised values of the Consolidated Gas Company's plants, as given by Mr. Mayer and the other experts for the company, are greatly in excess of their value. I have here some of the typewritten testimony and will have more of it shortly; but I want to know, Mr. Hough, whether or not you will take this testimony, go over it, and then let me know if you will appraise the plants and give to them a value substantially less than that given to them by Mr. Mayer."

To which Kirby says the claimant replied:

"That he couldn't say offhand whether or not he could testify that the values given by Mr. Mayer were greater than they should be; that he would like an opportunity of going over the testimony and would thereafter inform me whether or not he would be willing to testify for the state in the manner which I had requested."

Other conversations followed, between October 2d and October 6th, in one of which the claimant said:

"Well, Mr. Kirby, I have had an opportunity to examine enough of Mr. Mayer's testimony to be able to state that I can make an appraisal of the plants of the Consolidated Gas Company which will be materially less than that of Mr. Mayer's."

To which Mr. Kirby replied:·

"I am very glad, Mr. Hough, but do not let us have any misunderstanding about this. We don't want any slight reduction, because, you can well realize, a few hundred thousand dollars more or less on the value of the plants make very little difference in the case of a thousand cubic feet of gas."

To which, according to Kirby, the claimant answered:

"I mean a material, substantial reduction."

On cross-examination, Kirby further stated:

"I will give the conversation, Mr. Kellogg, of my best recollection. It was a conversation between Mr. Hough and myself relating to what the reduction should be, so that I said to Mr. Hough that the testimony of the state's witness as to the cost of the plants must be so much less than that of Mr. Mayer's as to have the difference represent several cents difference in the cost of gas per thousand cubic feet."

The terms of payment were also mentioned in this conversation. Kirby swore that the claimant said:

"That his terms would be a retainer fee of $1,000, and $50 for each day that he was actually engaged in the work; and, at the interview which I have now just testified to, Mr. Hough again made reference to his terms of employment, stating that it was his understanding that that should be as we have just stated. I said: 'Yes, Mr. Hough; that is my understanding, but I want to know what you mean by $50 a day; some men mean $50 whether they work on a case a day or whether they work all the day.' He said: 'Oh, no; I don't mean anything like that. I mean for a full day's work.' I said: 'All right, as far as the payment was concerned and as far as your services are concerned, I am well satisfied and very happy, because I feel you and I can work together, and I feel we can win this case.'"

This constituted the oral contract.

These conversations were followed, October 6th, by a confirmatory letter from the claimant to Kirby in which the former undertakes to state the terms of the oral agreement, from which there is an omission entirely of the agreement on the part of the claimant to testify to valuation substantially less than those of the Consolidated Gas Company's witnesses. The letter says:

"I am to serve you as one of the state's expert witnesses in appraisal of the Consolidated Gas Company's plant and properties other than real estate, and be prepared to answer such other questions as my knowledge may permit; on the basis of a retainer of one thousand dollars ($1000), and fifty dollars ($50) per day for services while engaged upon the work of examining, appraising, consulting, and testifying; it being understood that the minimum days to be charged shall be (10). In addition to the above, I am to be reimbursed for any expenses to which I may be put. The terms of payment to be $1000 down, and the remainder at such time as may be convenient; naturally, with the understanding that I may collect as against the state should the Legislature fail to pass the necessary appropriations. Will you kindly deliver to bearer the package of testimony that I am to take with me to-day?"

On October 9th, Kirby replied as follows:

"In reply to your communication of Oct. 6th, I have to say in behalf of the Attorney General of the state of New York that the terms and conditions set down therein are in accordance with my understanding and are satisfactory. There is some little formality to be gone through with before the $1000 is paid down; but, as soon as you return, I will put the necessary vouchers to be signed before you, and the amount should be forthcoming within a few days thereafter."

Then follow various letters from Kirby to the claimant and claimant to Kirby, from October 12th to November 15th, relating to the retainer mentioned in the letter of October 6th and relating to inventories and other matters connected with the gas litigation. The claimant did not receive the retainer specified in the agreement between him and the state, but waived its advance payment and proceeded to examine the plants involved in the litigation, and prepared estimates of their value, a summary of which in an incomplete form he submitted to Kirby in a letter dated November 4th. On that date he wrote to claimant, saying:

"I believe that, when the plant is finally totalled, my figures will be between 10 and 12½ per cent. below Mayer's figures."

But a reading of the entire letter shows that these figures were only tentative and not sufficient to justify the state in passing upon the question of the fulfillment of the contract at that time. In a letter to Kirby dated November 12th, he presented an incomplete estimate of an ideal plant.

On the day previous to the day set for the hearing, some time in the latter part of November, 1906, Kirby and Alfred R. Page, who also represented the state, had a final conversation with the claimant with reference to his testimony. Kirby testified with reference to this meeting:

"The last interview was had, as I said, on a Sunday morning. I do not remember the day, but I could place it, because it was the day before or the Sunday before the time set by the court for the testimony by the state on this point to be presented, and Senator Page and I met Mr. Hough in his office

and I said to Mr. Hough: 'Mr. Hough, the Senator and I are here. We have been trying very hard to get you for the last several days and have been unable to do so, and we regret you felt compelled to put the appointment off until this day, because it gives us too little time to go over your appraisal and to know just what your testimony is going to be.' Mr. Hough stated, 'Well, I have completed my work,' and he then showed us a statement which, to my best recollection, gave the total value."

The attention of the claimant was called to the fact that he had included in his estimates of value certain obsolete or abandoned apparatus and that his estimate was only about 10 per cent. below that of Mr. Mayer, one of the gas company's witnesses. To this criticism the claimant, according to Page, stated:

"That the things were there and the Consolidated Gas Company had paid for them and therefore he had allowed their reproduced cost."

Page further testified:

"We had considerable argument on the subject, he taking the attitude that, even though they were obsolete and would not be reproduced in a modern plant, but notwithstanding as the gas company had them, they were entitled to credit for them. * * * When I was talking during the end of this discussion with Mr. Hough, in regard to his testimony, I told him that his testimony in the present condition would be absolutely valueless; that we might as well leave testimony stand with Mayer's testimony as to put in his; and he then said he was no damned anarchist, and I wanted to know if he implied that I was, and he said, 'I won't join in any anarchistic raid upon this company.' Therefore, I said to Mr. Kirby, we better drop everything, and walked out."

To this comment Kirby testified he said:

"Why, Mr. Hough, that is no attitude for you to take. You were to be a witness in this case for the state of New York and not for the Consolidated Gas Company; and your attitude is certainly not that of a willing witness, but, on the contrary, it is that of a hostile witness—we can't permit you to testify with the figures you have given and attitude you have shown here at this conference."

The claimant testified that, in the course of this conversation, he stated to Page:

"I said I was a practicing engineer and had some regard for my reputation; that I was no damned anarchist and would not cut that estimate down below what I thought it was worth. Senator Page wanted to know if I called him an anarchist, and I said I didn't, but I was not employed to make a case for the gas company. I was an expert, made my estimate in an honest way, and they could use it or not as they saw fit."

The claimant presented himself at the hearing ready to testify, but was told that his testimony was of no value, and that he would not be put on the witness stand. In a subsequent conversation with him Page said:

"I told him I should not call him—could not use him; and he then asked the reason and I told him to be very frank I thought that his interests or relations were too close to the Consolidated Gas Company, and I should not use him as a witness."

These are substantially the facts upon which the court is called upon to say what contract was made between the state and the claimant, and whether or not he has fulfilled his contract so as to entitle him to the whole or any part of the amount demanded in his claim.

At the very outset we are met with the argument that the contract between the claimant and the state, the authority for the making of which is not disputed, was expressed in the letter dated October 6th, sent by the claimant to Kirby, and that the oral evidence introduced relating to a parol agreement to testify to valuations substantially lower than those of the gas company's experts was improperly received. In this contention the claimant overlooks the fact that the so-called written agreement does not embody all of the oral agreement which had been previously made. In the conversations prior to October 6th, it was distinctly agreed that the claimant was to furnish expert evidence of valuations which were to be substantially less than those testified to by Mr. Mayer, one of the gas company's witnesses. . Kirby was particular to impress upon the claimant that the valuations testified to by the state's witnesses must be "so much less than that of Mr. Mayer's as to have the difference represent several cents difference in the cost of gas per thousand feet." That was what was meant by a substantial reduction in the valuations, and was clearly understood by the claimant who stated, according to Kirby's testimony, that he could make "an appraisal of the plants of the Consolidated Gas Company which will be materially less than that of Mr. Mayer's." This part of the oral agreement was not inserted in the so-called written agreement; and parol evidence showing this portion of the agreement was admissible upon the principle of law that, where the original contract is verbal and only part is reduced to writing, the remainder may be shown by oral evidence.

The general rule requires the rejection of parol evidence when offered, to cut down or take away obligations entered into between parties and by them put in writing, but it does not apply where the original contract is verbal and entire and a part only is reduced to writing. Chapin v. Dobson, 78 N. Y. 74, 34 Am. Rep. 512; Juilliard v. Chaffee, 92 N. Y. 529; Schmittler v. Simon, 114 N. Y. 176, 21 N. E. 162, 11 Am. St. Rep. 621; Condit v. Cowdrey, 123 N. Y. 463, 25 N. E. 946; Routledge v. Worthington Co., 119 N. Y. 592, 23 N. E. 1111.

The rule applicable to written instruments is very clearly set forth in Thomas v. Scutt, 127 N. Y. 138, 27 N. E. 962: "It is a general rule that evidence of what was said between the parties to a valid instrument in writing either prior to or at the time of its execution cannot be received to contradict or vary its terms" but, where a written contract is not complete, evidence is permitted "not to contradict or vary but to complete the entire agreement of which the writing was only a part."

In Chapin v. Dobson, 78 N. Y. 74, 34 Am. Rep. 512, there was apparently an entire contract expressed in writing, but one of the parties was permitted to show that at the time that the written contract was made it was agreed orally that the machines mentioned in the contract should be made so that they would do the defendant's work satisfactorily because, as stated in the headnote, "the original contract was verbal and entire and a part only was reduced to writing."

In Routledge v. Worthington Co., 119 N. Y. 592, 23 N. E. 1111, a written contract had been made for the purchase of certain publications. The defendant was allowed to prove by oral evidence that plain-

tiff agreed in consideration of the purchase and as a part of the agreement that the trade price at which the publication had been sold should not be lowered. Judge Gray said:

"The rule which rejects parol evidence when offered with respect to a contract between parties and put in writing has no application to a case like this, where of the original agreement which has been executed a part only is in writing and the rest was verbal."

In Leary v. Moore, 48 Misc. Rep. 551, 96 N. Y. Supp. 266, in an action for the price of lumber, it appeared that upon the day after an oral order for the lumber was given a letter was written in which it was stated that the lumber would be furnished for $23.50 per thousand feet. Upon the trial evidence was excluded tending to show that this figure was an error, and that the oral contract was for $22.50 per thousand feet. This ruling was held to be erroneous on appeal; the court holding:

"The statement of the terms of an oral agreement for the purchase of lumber, contained in the written confirmatory letters or memoranda of one of the parties thereto, does not bind the writer; but he may show what the real contract was and in so doing may contradict or supplement the writings."

In Lichtenstein v. Rabolinsky, 75 App. Div. 66, 77 N. Y. Supp. 792, it was held that:

"Where, after the making of a verbal contract for the sale of a car load of busheling scrap, the vendor on the same day writes a letter to the vendee stating: 'We acknowledge sale to you this day of one car busheling for thirteen ($13.00) dollars per net ton and shall be glad to have your confirmation of your said purchase. Delivery at once,' and upon the following day the vendee writes a letter to the vendor stating: 'This confirms purchase made Jan. 15th, 1900, by Mr. M. Lichtenstein of Mr. Harry Rabolinsky of one carload of busheling scrap at $13.00 net ton delivered on cars. Hoping this is satisfactory, we remain,' such letters do not constitute a complete written contract, fixing the rights of the parties and rendering incompetent evidence that the verbal contract of sale embraced an express warranty as to the quality of the scrap to be delivered."

In Perry v. Bates, 115 App. Div. 337, 341, 100 N. Y. Supp. 881, 884, the court held that, when letters written between contracting parties purport merely to confirm the terms of a prior oral agreement, the letters are not controlling as to the terms of the contract, which may be shown by oral evidence which supplements or apparently contradicts the letters; and Judge Scott writing the opinion says:

"It is a common experience in ordinary business life that parties come to an oral agreement, and that subsequently one or both of the parties write confirmatory letters. In such cases it is considered that the oral agreement constitutes the real contract between the parties, and that the letters are to be treated merely as evidence of what had previously been orally agreed upon, and the rule is that the parties are not to be held bound by the statement of the terms of the contract as stated in the written confirmatory letters or memoranda, but may show what the real contract was, even if in so doing it may be necessary to supplement or apparently contradict the written paper."

In Briggs v. Hilton, 99 N. Y. 517, 3 N. E. 51, 52 Am. St. Rep. 63, an action was brought to recover the price of certain cloths, and plaintiff put in evidence a writing from the defendant acknowledging the receipt of an order for the goods, stating the time of delivery and the price, and thereafter objected to any oral testimony on the part of the

defendant tending to prove a warranty of the goods, on the ground that the order contained the contract between the parties. The Court of Appeals held that:

"The objection was untenable; that the writing did not estop defendant from proving a parol warranty as to quality, as it was a mere memorandum and not the contract between the parties; that, even if the writing be construed as embodying a part of the contract, and thus conclusive as to such part, parol evidence was admissible to show the rest."

In the light of these cases and of very many others of like tenor to which it is not deemed necessary to refer specifically (Julliard v. Chaffee, 92 N. Y. 529; Medical College Lab. v. New York University, 76 App. Div. 48, 78 N. Y. Supp. 673; Brantingham v. Huff, 43 App. Div. 414, 60 N. Y. Supp. 157; Gibbons v. Bush Co., 52 App. Div. 211, 65 N. Y. Supp. 215; Indelli v. Lesster, 130 App. Div. 548, 115 N. Y. Supp. 46; Studwell v. Bush Co., 126 App. Div. 818, 111 N. Y. Supp. 293), it seems clear that the contract made with the claimant was that he should make an examination of the plants of the gas company and testify to valuations substantially lower than those of the company's experts. He claims that he could not have made such a contract at the time stated, because it was not possible for him, between October 2d, when he had his first conversation with Kirby, and October 6th, when his letter was written to Kirby stating the terms of the alleged contract, to have made an appraisal sufficient to say whether or not his estimate would be substantially less than that of the company's experts. The answer to this position is that, if that was a fact, he should not have entered into the contract until he could have so determined; because, as a man of experience, he must have known that his testimony was desired to offset that introduced on behalf of the company. When he was approached by Kirby, he was told that his services were desired as an expert by the state, and he knew that the state was endeavoring to sustain the legality of the 80-cent gas statute, and that to do so it was necessary to introduce evidence of valuations substantially lower than those put in evidence by the gas company. He did not, at the first interview, agree to testify, but said that he would like an opportunity to consult with his friends, for, "possibly, it would be wise for me not to testify." If his valuations were not to be substantially less than those of the company's experts, the question of expediency would not have entered into the matter. In his redirect examination he was asked whether he had made the statement, as testified to by Kirby, that the claimant had had an opportunity to examine the matter sufficiently to state that he could make an estimate materially less than that of Mayer, and he replied, "I did not know at that time whether I was going to testify or not. I wanted to see first what he wanted me to do," showing that the claimant knew what was expected of him when he entered into the contract. The claimant further stated, "Mr. Kirby told me he considered the figures put in by the gas company exorbitant and extravagant and I don't remember the exact words, and he hoped I would be able to make them lower," to which he replied: "I didn't know whether I would accept the employment," indicating that he knew that he was to produce testimony to offset that introduced by the gas company and that he was consid-

ering the matter in order to enable him to determine whether or not he could conscientiously swear to valuations that would be of material assistance to the state.

It is apparent that the agreement between the parties was that the claimant should testify to valuations substantially less than those of the gas company's experts, and this he failed to do. The estimate of Mayer, whose testimony claimant examined at length, was $16,098,893 and claimant's final estimate was $14,359,827, making a difference of only $1,639,066 or about 11 per cent. less than Mayer's estimate. This did not mean a sufficient reduction in the valuation of the plant so as to represent "several cents difference in the cost of gas per thousand cubic feet." When confronted in the final interview by the fact that his estimate would have no effect practically upon the price per thousand cubic feet of gas, and that it was practically Mayer's estimate, claimant replied:

"What do you think I am. I am not any damned Socialist, anyhow, trying to hit this Consolidated Gas Company crowd over the head."

The claimant is clearly not entitled to recover anything for compensation under the agreement as it has been found to exist. The contract is an entire one; and, upon its breach, the claimant forfeited not only the stipulated sum per day which he was to be paid but also the retainer. There is no rule of law which, in the absence of an agreement, allows an expert a retainer fee merely to keep him from the other side. It is all a matter of contract. In this case there was no agreement that the retainer was to be paid in any event, merely to keep the claimant from the other side, but rather that it should form a part of the compensation to be allowed the claimant. In Tenney v. Berger, 93 N. Y. 524, 45 Am. Rep. 263, Judge Earl, speaking of the compensation of an attorney, says that, where an attorney is retained to conduct a legal proceeding, he enters into an entire contract, and that, in order to earn his compensation, he must show full performance. Bathgate v. Haskin, 59 N. Y. 533; Andrews v. Tyng, 94 N. Y. 16; Pickard v. Pickard, 83 Hun, 338, 31 N. Y. Supp. 987.

The item for disbursements, amounting to $350 for services of F. H. Guenther and F. S. Rue in estimating quantities, buildings, etc., and tabulating and typewriting schedules, should be allowed. These persons were hired by the claimant to assist him, pursuant to proper authority. He is responsible for the payment of the services, and is entitled to recover the amount thereof.

Thre was a sufficient appropriation available at the time of the making of the contract with the claimant to satisfy his claim. The appropriations for the year 1906 became available on the 1st day of October, and the statement submitted by the State Comptroller shows that there were abundant funds subject to the control of the Attorney General to justify the contract made with the claimant and to pay for any services legally recoverable thereunder.

The claimant, therefore, should have an award for $350, with interest thereon from the date of the payment of the disbursements.

Judgment accordingly.